Stephen C. Seto, Esq. (SBN 175458)
**SETO WOOD & SCHWEICKERT** LLP
2300 Contra Costa Blvd., Suite 310
Pleasant Hill, CA 94523
(925) 938-6100 – fax (925) 262-2318
sseto@wcjuris.com

Attorneys for Defendant/Counterclaimant
SCOTT RICHARDS and US RAIL SYSTEMS, INC.



# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMEER ALGHUSAIN, <br><br> Plaintiff, <br><br> v. <br><br> CALTRAIN, US RAIL SYSTEMS, INC., SOUND TRANSIT, HERZOG, INC., SCOTT RICHARDS, EMILIE JOHNSON, PHIL GILMOUR, JOHN HOGAN, JAMES HARRISON, WILLIAM SMITH <br><br> Defendants. <br><br><hr> AND ALL RELATED ACTIONS | CASE NO. 3:25-cv-09670-JSC <br><br> [Related Case No. 3:24-cv-01863] <br><br> **US RAIL SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF US RAIL SYSTEM'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:   February 5, 2026 <br> Time:   10:00 A.M. <br> Ctrm:   8 <br><br> Hon. Jacqueline Scott Corley |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 5, 2026, at 10:00 a.m., or as soon as thereafter as counsel may be heard in Courtroom 8 of the above-entitled Court, located at 450

-1-

**MPA I/S/O PRELIMINARY INJUNCTION**

4899-5378-3685, v. 1

1   Golden Gate Avenue, San Francisco, California, Defendant / Counterclaimant US RAIL

2   SYSTEMS, INC. ("USRS"), will and hereby does move the court for a preliminary injunction

3   enjoining Ameer Alghusain from directly or indirectly:

4       1.   Contacting or attempting to contact any USRS employees for any purpose; and

5       2.   Contacting or attempting to contact USRS contractors/clients, Caltrain, Sound

6           Transit, Dallas Area Rapid Transit, US High Speed Rail Association, Transit

7           Services Inc., Jacobs, HNTB, Herzog Inc., Amtrak, and Siemens, for the purpose of

8           asserting or implying that USRS stole, misappropriated or is improperly using his or

9           his company's intellectual property, including the trademark "US Rail" or "US Rail

10          Systems."

11       As explained in the accompanying memorandum of points and authorities, good

12  cause exists for an injunction because (1) USRS is likely to succeed on the merits, (2) USRS is

13  likely to suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in

14  USRS's favor, and (4) an injunction is in the public interest.

15       This motion is based on this notice of motion and motion, the accompanying

16  memorandum of points and authorities, the Declarations of Scott Richards and Stephen Seto and

17  attached exhibits, the pleadings and records on file in this action, such additional authority and

18  argument as may be presented in any reply and at the hearing on this motion, and such other

19  matters of which this Court may take judicial notice.

20       As required by L. R. 65-1(a)(1), a copy of the Second Amended Complaint is attached as

21  **Exhibit 1**.

22  Dated: December 29, 2025         **SETO WOOD & SCHWEICKERT**LLP

23

24

25                        _____
                          Stephen C. Seto, Esq

26                        Attorneys for Defendant/Counterclaimant
                          SCOTT RICHARDS and US RAIL SYSTEMS, INC.

27

28

**MPA I/S/O PRELIMINARY INJUNCTION**

4899-5378-3685, v. 1

## MEMORANDUM OF POINTS AND AUTHORITIES

US RAIL SYSTEMS, INC., ("USRS") submits this Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction enjoining Ameer Alghusain from directly or indirectly:

1. Contacting or attempting to contact any USRS employee for any purpose; and

2. Contacting or attempting to contact USRS contractors/clients, Caltrain, Sound Transit, Dallas Area Rapid Transit, US High Speed Rail Association, Transit Services Inc., Jacobs, HNTB, Herzog Inc., Amtrak, and Siemens, for the purpose of asserting or implying that USRS stole, misappropriated or is improperly using his or his company's intellectual property, including the trademark "US Rail" or "US Rail Systems."

## I.     INTRODUCTION

Scott Richards previously was the president of United Construction Management Corporation ("United").  United retained Alghusain as an engineering consultant on a Caltrain project (the "Project") but fired him five weeks later due to Alghusain's unauthorized field activity, poor judgment, and improper use of confidential information.  Following his termination, Alghusain retaliated by filing this lawsuit and asserting more than a dozen causes of action against Richards, including that Richards stole Alghusain's intellectual property, including trademarks, to form USRS (the "IP Claims").  Alghusain then contacted USRS's employees and Caltrain demanding that they stop working with USRS based on the IP claims.

As a direct result of this campaign, former USRS employee Kieran Mountain resigned in May 2025 after Alghusain sent him LinkedIn messages warning Mountain to stop working on USRS projects or be named as a defendant in a $35,000,000 lawsuit that Mountain "could not afford."

In June 2025, the Court dismissed the IP Claims.  That ruling, however, did not stop Alghusain's campaign against Richards and USRS.  He continued to send "cease and desist" emails to USRS's business contacts alleging that USRS had stolen his intellectual property.  As a result of those emails, one of USRS's clients, Sound Transit, stopped payment on a $400,000

**MPA I/S/O PRELIMINARY INJUNCTION**

1  invoice, which prevented USRS from paying making payroll.

2       Alghusain additionally created a US Railways LinkedIn page that lists its trademark as

3  US Rail and links to USRS's LinkedIn page, increasing marketplace confusion.  He has also

4  attempted to connect with USRS's new employee.  USRS requested that Alghusain stop, but

5  Alghusain refused.

6       On November 5, the Court granted USRS's Motion for a Temporary Restraining Order

7  ("TRO") enjoining Alghusain from contacting USRS's employees, contractors, and clients for

8  the purpose of asserting that USRS stole or is improperly using his or his company's intellectual

9  property, including the trademarks "US Rail" or "US Rail Systems."  Despite the TRO,

10  Alghusain continued to contact USRS employees and clients, filed a new action against USRS's

11  employees and clients asserting the same claims already dismissed in this case, and threatened

12  USRS's attorneys with a RICO action, each in direct violation of the TRO.

13       USRS cannot risk further disruption to its business, including the loss of employees or

14  an inability to meet payroll due to Alghusain's continued misconduct. USRS therefore seeks a

15  preliminary injunction continuing the Court's TRO and enjoining Alghusain from (1) directly or

16  indirectly contacting USRS's employees and (2) contacting or attempting to contact USRS

17  contractors/clients, Caltrain, Sound Transit, Dallas Area Rapid Transit, US High Speed Rail

18  Association, Transit Services Inc., Jacobs, HNTB, Herzog Inc., Amtrak, and Siemens, for the

19  purpose of asserting or implying that USRS stole, misappropriated or is improperly using his or

20  his company's intellectual property, including the trademarks "US Rail" or "US Rail Systems."

21  **II.    STATEMENT OF FACTS[1]**

22       Richards was the former president of United, which was working on defendant Balfour's

23  electrification project with Caltrain (the "Project").  In June 2023, United retained Alghusain as

24  an electrical engineering consultant on the Project to review technical data in written submittals

25  prepared by other Balfour or United workers for errors and either sign off on the submittals or

26  return them to the drafter for revisions.  After approval by Alghusain, the submittals were

27  subject to additional layers of document control and review before being transmitted to Caltrain

28  _____

[1] All facts are attested to in the accompanying Declaration of Scott Richards.

**MPA I/S/O PRELIMINARY INJUNCTION**

4899-5378-3685, v. 1

for its own independent analysis. Alghusain's role was limited to that of a technical reviewer—one of many professionals in a multi-step review process—and did not involve authorship, ownership, or control over the submittals.

On August 2, 2023, Alghusain went out into the field unbeknownst to United. When Alghusain returned, a supervisor told him he was not to perform tasks outside of his submittal review without getting prior approval from a United supervisor.

The next day, Alghusain went out into the field again in direct disobedience of United's instructions. During this unauthorized field visit, Alghusain used a confidential access code gained during his prior employment at Caltrain to enter a restricted electrified rail yard (CEMOF). This restricted area was "live" and required proper safety gear and a Caltrain representative to always be with visitors, which was not the case.

On August 7, 2023, after five weeks, United terminated its agreement with Alghusain because of his refusal to comply with United's express instructions given the day before to not go into the field without authorization, poor judgment, and improper use of confidential information.

**Alghusain embarks on his Revenge Tour Against Scott Richards**

On March 26, 2024, Alghusain sued Richards claiming that Richards defamed him and presented Caltrain Alghusain's confidential technical knowledge as his own.

On June 12, 2024, Alghusain amended his complaint asserting claims against Richards for (1) violating the Federal Railroad Safety Act and National Transit Systems Security Act (the "Railroad Claims"), (2) violating the wage and hour laws, (3) unjust enrichment, (4) breach of the implied covenant of good faith, (5) fraud, (6) defamation, and (7) intentional infliction of emotional distress.

Richards subsequently left United as part of an agreement with the co-owner of United, Ammar Alsarabi. On July 29, 2024, Richards formed USRS by filing its Articles of Organization with the California Secretary of State. On September 26, 2024, Richards filed a Statement of Information indicating that he was the sole officer and director of USRS. USRS then contracted with Caltrain and TASI to work on the Project.

**MPA I/S/O PRELIMINARY INJUNCTION**

On August 26, 2024, Alghusain emailed seven Caltrain officials claiming:

> Please be advised that defendant Mr. Scott Richards who owns 50% of the shares of United that won this contract has elected to dissolve the company United, he has taken cash from corporate bank accounts and is planning to leave the country after he declares bankruptcy. This contract must be stopped immediately before Tasi or Caltrain get financial harm and carry on liabilities and fraudulent documents that I produced for United and BBII.

**Alghusain Begins Threatening USRS Employees**

On October 3, 2024, Alghusain sent LinkedIn messages to USRS employee, Kieran Mountain, warning him to stop working on the Project or be added as a defendant in this action. He warned that the damages were $35,000,000 and that Mountain "can't afford this."

Alghusain further threatened Mountain saying that Richards was misusing the name "US Rail" which Alghusain claimed was a trademark of American Railways, a company he purported to own. Alghusain demanded that Mountain cause Richards to pay him $360,000, threatening to sue Mountain if that demand was not met.

Around the same time, USRS's Chief Operations Officer, Phil Gilmour, received a telephone call from an "unknown" number. The person screamed, "see you in federal court" causing Gilmour significant stress, anxiety, and worry. Several USRS employees subsequently contacted Gilmour worried and anxious about how Alghusain's conduct could affect their employment and livelihood.

In November 2024, Mountain began searching for new employment and, in December he resigned from USRS. As a result, USRS lost more than $400,000 because Mountain was not replaced on the Project.

On January 23, 2025, Alghusain formed American Railways by filing its Articles of Organization with the California Secretary of State. The filing lists Alghusain as the organizer and gives its business address as 3000 El Camino Real, Palo Alto, CA 94306 ("Alghusain Address").

Twelve days later, on February 4, 2025, Alghusain / American Railways, emailed USRS's business Partner, Mac Products, falsely claiming that USRS had fraudulently obtained a

**MPA I/S/O PRELIMINARY INJUNCTION**

1  $20 million contract with Balfour by using Alghusain / American Railways intellectual property

2  including the tradename "US Rail."  The email claims Mac Products is "equally liable for

3  millions of dollars in damages assisting Scott Richards and CAL TRAIN thru infringement of

4  our knowledge and experience in the rail industry." It demands that Mac Products refrain from

5  using Alghusain / American Railways's name "US Rail" and using its intellectual property.

6  **Alghusain adds Claims Against Richards for Stealing his Trademarks and Other**

7  **Intellectual Property**

8  On March 3, 2025, Richards moved to dismiss Alghusain's non-wage and hour claims

9  against him.  Rather than oppose the motion, on April 18, 2025, Alghusain filed a second

10  amended complaint ("SAC") against Richards withdrawing the existing non-wage and hour

11  claims and replacing them with a claim for intentional interference with prospective economic

12  advantage ("IIPEA") and federal and state law claims against Richards and USRS claiming they

13  stole his trade secrets (the "IP Claims").  The IP Claims assert that

> Prior to his work at United and Balfour, Mr. Alghusain developed important
> technical documents bearing his brand names, trademarks, and service
> marks American Rail™, American Railways™, US RAIL™, USA Rail™,
> and he developed the following documents for future use/contracts with
> CALTRAIN, HERZOG and possible Balfour future work and others, these
> documents and intellectual property are the sole ownership of Mr.
> Alghusain.

18  The documents (the "Documents") Alghusain allegedly created concern "Operations and

19  Maintenance of Electric Trains, and Operations and Maintenance of Equipment related to

20  Electric Trains," "Maintenance of overhead power systems," and Operations and Maintenance

21  of transformers and supporting power systems.

22  Paragraph 102 of the SAC contends that after Mr. Alghusain was terminated, Richards

23  and his co-worker Wayne Richardson used the Documents to create USSR.  Paragraph 103

24  alleges that Richards formed USRS, and used Alghusain trade secrets, trade names, trademarks,

25  know-how, customers lists and highly valuable technical manuals and they used his business

26  bidding files to obtain three contracts in the US, one with CALTRAIN for $1.5 million, one

27  with HERZOG TASI for $1.6 million and one for $500,000 with Dallas Area Rapid Transit.

28  SAC paragraphs 104-105 states that Richards used Alghusain's trademark and other

**MPA I/S/O PRELIMINARY INJUNCTION**

1  intellectual property and that he is entitled to damages and an injunction to prevent Richards

2  from benefiting from such use.

3        **The IP Claims are Dismissed and Alghusain Begins Threatening USRS's Business**

4        **Partners Using the Pseudonym SENAID Electrify.**

5        On May 12, 2025, Richards and USRS moved to dismiss the IP Claims.  On June 10,

6  2025, the Court granted the motion to dismiss with leave to amend.  Alghusain did not amend

7  the SAC.  Instead, on October 15, 2025, Alghusain sent a "cease and desist" email to one of

8  USRS's business contacts, Robert Pearsall, a director with US High Speed Rail in Washington

9  D.C, which is a trade group.  The e-mail claims that USRS had "secured multiple multi-million-

10  dollar contracts using the unauthorized mark "US Rail Systems."  It further claims, "our

11  registered or unregistered trademarks, service marks, and trade names [include] US Rail and

12  American Rail" and that "[t]he following trademarks and service marks are exclusively owned

13  by American Railways Company . . . US Railways . . . US Rail" and that the sender intends "to

14  bring these contracts and related transactions to the attention of the courts of proper

15  jurisdiction—whether state, federal, or USPTO proceedings—for judicial review and

16  appropriate relief."

17        The email is signed "SENAID Electrify" but is clearly from Alghusain because (1) he

18  stated in the SAC that he was the sole owner of the trademarks American Railways Company,

19  US Railways and US Rail and (2) the business address for "SENAID Electrify" is the Alghusain

20  Address.

21        On October 21, 2025, Alghusain, through Senaid Electrify, sent a "cease and desist"

22  email to Sound Transit.  The email alleges that Sound Transit was "supporting or enabling" US

23  Rail which "had repeatedly and willfully infringed on the registered and common law

24  trademarks of American Railways LLC, including its subsidiaries US Rail and SENAID

25  Railways.  The e-mail contends that USRS had misappropriated SENAID's IP, know how,

26  manual, etc.  SENAID warns that if Sound Transit does not stop using its intellectual property

27  obtained from USRS, it will file an action with the Court.  It also requests copies of all contracts

28  between USRS and Sound Transit

Sound Transit informed USRS it would not pay a $400,000 invoice while it was investigating Alghusain's allegation. This caused a serious disruption to USRS's business, including USRS being unable to pay employees and having to take out loans to cover its cash shortfall. Employees have also complained about their jobs and receiving unwanted contact from Alghusain. This has created significant stress and business disruption at the company's highest levels.

**Alghusain Continues Contacting USRS employees**

On October 29, Alghusain created a LinkedIn page for US Railways claiming it held the trademark for US Rail and USRS. The link for USRS goes to USRS's LinkedIn page

Also, on October 29, Alghusain contacted Alyssa Walker, a new employee at USRS, requesting that they connect on LinkedIn. Walker informed her USRS supervisor of the request and that she wanted no contact with Alghusain.

**Alghusain Files a Second Complaint against USRS clients and employees and Violates the Temporary Restraining Order**

On November 10, Alghusain filed *Alghusain v. Caltrain et al.* (Case No. C25-0670) (the "Second Action"), naming USRS's clients and employees as defendants and asserting many of the same claims that were already dismissed in the First Action.

The Second Action represents an effort to circumvent the Court's TRO and continue interfering with USRS's business through litigation by naming many of USRS's key clients and employees as defendants. The following defendants named in the Second Action are USRS or Richards business contacts:

> Caltrain – $1.6 million contract with USRS for electrification support services
>
> Sound Transit – support service contract with USRS involving $50 million contract
>
> Herzog, Inc. / TASI –s $1.5 million contract with USRS
>
> Emilie Johnson – Scott Richards's sister; HR manager for USRS
>
> Phil Gilmour – USRS chief operating officer
>
> William Smith – USRS vice president

**MPA I/S/O PRELIMINARY INJUNCTION**

Seto • Wood
Schweickert™

John Hogan – Caltrain former chief operating officer

James Harrison – Caltrain general counsel

On November 17, Richards and USRS, through their attorney, notified Alghusain via email that they intended to file a Motion for Rule 11 Sanctions against Alghusain for this second complaint.  Declaration of Stephen Seto ("Seto Decl."), ¶ 2; Exh. 1 to the Seto Decl. That same day,  Alghusain sent an email to USRS clients, including Caltrain, DART, and Sound Transit, raising a "Federal Railroad Safety Alert" claiming that Richards "may be struggling or facing suicidal thoughts." *Id.*, ¶ 3; Exh. 2 to the Seto Decl.  Alghusain further "urge[d] all recipients" to direct Richards to "employee-assistance programs" or "suicide-prevention resources" "for the safety of the public, the workforce, and Mr. Richards himself," thereby falsely implying to USRS's clients and business contacts that Richards posed a safety risk and was unfit to perform his professional duties.  *Ibid*.

On November 19, Alghusain emailed USRS attorneys, Karen and Stephen Seto, threatening to name Ms. Seto as a defendant in a RICO action unless she "withdr[e]w or resign[ed] as agent" for USRS, as she was the designated agent for service of process for USRS. *Id*., ¶ 4; Exh. 3 to the Seto Decl.

On December 11, 2025, Alghusain sent another email to Karen and Stephen Seto threatening further action based on alleged "significant and undisclosed conflict-of-interest issues" as they are married and are both attorneys for Richards and USRS, and demanding recusal or disqualification.  *Id. ¶* 5; Exh. 4 to the Seto Decl.

## III.   ARGUMENT

### A.  The Court Should Enjoin Alghusain From Contacting or Attempting to Contact any USRS Employee for any Purpose.

Fed. R. Civ. Proc. 65 sets the standard that must be satisfied to for injunctive relief.  A claimant seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* 555 US 7, 20 (2008); *Matsumoto v. Labrador*, 122

Seto • Wood
Schweickert™

1    F.4th 787, 804 (9th Cir. 2024).

2        As set forth below, USRS has satisfied the requirements for a preliminary injunction

3    enjoining Alghusain, directly or indirectly, from contacting USRS employees based on his

4    intentional interference with Kieran Mountain's employment at USRS.

5        *1.   USRS Will Likely Succeed on its Intentional Interference with Contractual*

6             *Relations and Prospective Economic Advantage Claims.*

7        The elements for intentional interference with contractual relations are (1) the existence

8    of a valid contract between the claimant and a third party; (2) the defendant's knowledge of that

9    contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the

10   contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

11   resulting damage.  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).

12       USRS satisfies each element.  First, USRS had an existing employment relationship with

13   Kieran Mountain.  Second, Alghusain was aware of that relationship since he contacted

14   Mountain directly and demanded that Mountain stop working with USRS and stop using

15   Alghusain's intellectual property.  Third, Alghusain's demand that Mountain terminate his

16   employment with USRS was an act clearly designed to disrupt USRS's contractual relationship.

17   That conduct is particularly egregious because it was predicated on the IP Claims, which the

18   Court dismissed and Alghusain never amended.  Fourth, USRS's relationship with Mountain

19   was in fact disrupted when Mountain resigned from USRS, causing USRS to lose hundreds of

20   thousands of dollars in revenue.

21       USRS also satisfies the requirements for intentional interference with prospective

22   economic advantage ("IIPEA").  The elements for IIPEA are the same as for interference with

23   contractual relations, except the claimant must plead that the respondent engaged in an

24   independently wrongful act.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,

25   1158 (2003).

26       Here, USRS has a claim for IIPEA based on Alghusain's interference with Mountain's

27   employment.  "A third party's "interference with an at-will contract is actionable interference

28

-11-

**MPA I/S/O PRELIMINARY INJUNCTION**

1   with the contractual relationship" because the contractual relationship is at the will of the

2   parties, not at the will of outsiders." *Reeves v. Hanlon*, *supra,* 33 Cal. 4th at 1148.

3   Alghusain's conduct—threatening Mountain with baseless litigation grounded in claims already

4   dismissed by the Court—constitutes independently wrongful conduct sufficient to support

5   USRS's IIPEA claim.

6           *2.   USRS Will Likely Succeed on its Unfair Competition Claims*

7           The elements of an unfair competition claim under California's Unfair Competition Law

8   (UCL) are that (1) the claimant suffered an injury in fact by the loss or deprivation of money or

9   property, and (2) the injury was a result of unfair competition.  Cal. Bus. & Prof. Code § 17204.

10  California Business and Professions Code § 17200 defines "unfair competition" as "any

11  unlawful, unfair or fraudulent business act or practice."  "A tortious interference with contract

12  claim can serve as a predicate 'unlawful' business practice for UCL purposes." *Moore v. Apple*,

13  73 F.Supp.3d 1191, 1205 (N.D.Cal. 2014); see also *CRST Van Expedited Inc*., *v. Werner*

14  *Enterprises, Inc*. 479 F.3d 1099, 1109 (9th Cir. 2007).

15          As explained above, USRS suffered economic injury as a result of unfair competition

16  when Alghusain's threats disrupted USRS's employment relationship with Mountain, causing

17  Mountain's resignation and resulting in hundreds of thousands in losses.  Because USRS is

18  likely to prevail on its intentional interference with contractual relations and IIEPA claims, and

19  such claims can also constitute unlawful business practices under the UCL, USRS will likely

20  also prevail on its unfair competition claims against Alghusain.

21          *3.   USRS is likely to Suffer Irreparable Harm Absent Injunctive Relief*

22          A "substantial loss of business and perhaps even bankruptcy" absent preliminary

23  injunctive relief shows "irreparable injury." *Doran v. Salem Inn, Inc.,* 422 US 922, 932 (1975);

24  *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F3d 60, 67 (2nd Cir. 2007) (loss of

25  current or future market share may constitute irreparable harm).

26          Here, the loss of a valuable employee caused USRS to lose more than $400,000 as he

27  was not replaced on the Project, which constitutes irreparable harm.

28          *4.   The Balance of Equities Tips in USRS's Favor*

**MPA I/S/O PRELIMINARY INJUNCTION**

Seto • Wood
Schweickert℠

The balance of the equities overwhelmingly favors USRS.   Alghusain has already forced one of USRS's employees to resign and has continued to harass and threaten USRS's remaining and newly hired personnel.  He also has violated the TRO by continuing to contact and threaten USRS employees, contractors, and clients.  Alghusain's conduct is premised on IP Claims that have already been dismissed with prejudice after his refusal to amend.  Alghusain knows his claims have been dismissed which is why he is hiding behind the name SENAID. By contrast, USRS seeks only to protect its employees, business relationships, and ability to operate free from harassment and unlawful interference.

Absent a preliminary injunction, USRS faces the ongoing risk of further employee attrition, disruption to its business relationships, and irreparable harm that cannot be adequately remedied by monetary damages.

### 5. An Injunction is in the Public Interest

An injunction is in the public's interest because USRS's employees should not be harassed or forced to resign based on specious claims.

**B. The Court Also Should Enjoin Alghusain From Contacting or Attempting to contact USRS contractors/clients, Caltrain, Sound Transit, Dallas Area Rapid Transit, US High Speed Rail Association, Transit Services Inc., Jacobs, HNTB, Herzog Inc., Amtrak, and Siemens, for the Purpose of Asserting or Implying That USRS Stole, Misappropriated or is Improperly Using his or his Company's Intellectual Property, Including the Trademark "US Rail" or "US Rail Systems."**

USRS also has satisfied the requirements for a preliminary injunction enjoining Alghusain, directly or indirectly, from contacting USRS contractors and clients based on his intentional interference with the Sound Transit Contract.

### 1. USRS Will Likely Succeed on its Intentional Interference with Contractual Relations and Prospective Economic Advantage Claims.

USRS again satisfies each element for an intentional interference with contractual relations claim.  First, USRS and Sound Transit are parties to the valid Sound Transit Contract.

**MPA I/S/O PRELIMINARY INJUNCTION**

Second, Alghusain was aware of that contract since he contacted Sound Transit directly and demanded that it stop working with USRS and stop using Alghusain's intellectual property. Third, Alghusain's demand that Sound Transit terminate its relationship with USRS was an act clearly designed to disrupt USRS's contractual relationship.  Alghusain's actions are particularly egregious since his demands are based on the IP Claims which the Court dismissed and Alghusain never amended.  Fourth, USRS's relationship with Sound Transit was in fact disrupted when Sound Transit failed to pay a $400,000 invoice under the Sound Transit Contract because of Alghusain's interference, leaving USRS unable to make payroll.

USRS also satisfies the requirements for IIPEA.  Here, Alghusain's independently wrongful act was informing Sound Transit that he owned the "US Rail" trademark and that USRS was improperly using his intellectual property, notwithstanding that the Court dismissed the IP Claims with prejudice.  Alghusain actions were wrongful and caused USRS economic harm. USRS is, therefore, likely to prevail on its IIPEA claims.

### 2. USRS Will Likely Succeed on its Unfair Competition Claims

As explained above, USRS suffered an economic injury as a result of unfair competition when Sound Transit failed to pay a $400,000 invoice as a result of Alghusain's false intellectual property allegations and threats.  Because USRS will likely prevail on its intentional interference with contractual relations and IIEPA claims, and such claims can also constitute unlawful business practices under the UCL, USRS also will likely prevail on its unfair competition claims against Alghusain.

### 3. USRS is likely to Suffer Irreparable Harm Absent Injunctive Relief

A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury." *Doran v. Salem Inn, Inc.,* 422 US 922, 932 (1975); *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F3d 60, 67 (2nd Cir. 2007) (loss of current or future market share may constitute irreparable harm).

Here, the inability to make payroll because Sound Transit did not pay a $400,000 invoice constitutes irreparable harm -  especially since $400,000 represents 80% of USRS's monthly revenue.

**MPA I/S/O PRELIMINARY INJUNCTION**

### 4. The Balance of Equities Tips in USRS's Favor

The balance of the equities clearly favors USRS. Alghusain is interfering with USRS's primary contract and has caused it to miss payroll. Furthermore, Alghusain has already violated the existing TRO by continuing to contact and threaten USRS employees, contractors, and clients. Alghusain is doing this based on IP Claims that have been dismissed with prejudice after his refusal to amend. Alghusain knows his claims have been dismissed which is why he is hiding behind the name SENAID. USRS needs an injunction to prevent Alghusain from causing further irreparable harm.

### 5. An Injunction is in the Public Interest

An injunction is in the public's interest because USRS's employees need to be paid.

## IV.    CONCLUSION

Alghusain has a boundless vendetta against Richards which extends to USRS's companies, employees and customers. Wherefore, USRS respectfully requests that the Court issue a preliminary injunction enjoining Alghusain from directly or indirectly:

1. Contacting or attempting to contact any USRS employees for any purpose; and

2. Contacting or attempting to contact USRS contractors/clients, Caltrain, Sound Transit, Dallas Area Rapid Transit, US High Speed Rail Association, Transit Services Inc., Jacobs, HNTB, Herzog Inc., Amtrak, and Siemens, for the purpose of asserting or implying that USRS stole, misappropriated or is improperly using his or his company's intellectual property, including the trademark "US Rail" or "US Rail Systems."

Dated: December 29, 2025

**SETO WOOD & SCHWEICKERT** LLP

_____
Stephen C. Seto, Esq.
Attorneys for Defendant/Counterclaimant
SCOTT RICHARDS and US RAIL SYSTEMS, INC.

**MPA I/S/O PRELIMINARY INJUNCTION**

EXHIBIT 1

Gregory G. Paul (SBN 233060)
PAUL LAW OFFICES
540 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 326-8300
Facsimile: (888) 822-9421
Email: gregpaul@paullaw.com

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMEER ALGHUSAIN, | Case No. 3:24-cv-1863-JSC |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | |
| BALFOUR BEATTY INFRASTRUCTURE, INC., PETER WEBB, WAYNE RICHARDSON, SCOTT RICHARDS and U.S. RAIL SYSTEMS, INC., | Complaint Filed: March 26, 2024<br>Amended Complaint Filed: June 12, 2024<br>Trial Date: August 18, 2026<br><br>Honorable Jacqueline Scott Corley |
| Defendants. | |

AND NOW comes the plaintiff, Ameer Alghusain, by and through his attorney, Gregory G. Paul, and files the following Second Amended Complaint under state and federal laws concerning retaliation, unpaid wages, defamation, interference with prospective economic relations and misappropriation of trade secrets.

## **NATURE OF ACTION**

1.     This is a proceeding to remedy breach of contract, retaliation and unpaid wages seeking declaratory and injunctive relief and for damages against defendants to redress the deprivation and violation of rights secured to the plaintiff.

1

2.      Plaintiff seeks a declaratory judgment and injunctive relief to restrain Defendants from maintaining practices, policies, customs, and usages, which retaliate against Plaintiff for making informal and formal complaints about safety.

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S. Code § 1331. Federal question jurisdiction arises pursuant to U.S. Codes: 49 U.S.C. § 20109 and 6 U.S.C. § 1142 and supplemental jurisdiction pursuant to 28 U.S. Code § 1367.

4.      Venue lies within this judicial district, since the substantial actions complained of herein occurred within the Northern District of California while Mr. Alghusain worked on the CALTRAIN Project in San Mateo, California including the CALTRAIN Peninsula Corridor Electrification Project (PCEP) of the 52-mile corridor between San Francisco and San Jose.

## PARTIES

5.      Plaintiff, Ameer Alghusain, is a resident of Santa Clara County, California.

6.      Defendant, Balfour Beatty Infrastructure, Inc. (hereinafter referred to as "Balfour" or "Defendants", is an employer, contractor and/or sub-contractor as defined by the Federal Railroad Safety Act (FRSA), National Transit Systems Security Act (NTSSA), and under the California Labor Code, located at 2121 South El Camino Real, Suite 1000, San Mateo, California 94403. Under a contract with the Peninsula Corridor Joint Powers Board, Balfour is the design-build contractor for the design and construction of the Caltrain Modernization Early Investment Program, Electrification Design-Build Servies Project.

7.      Defendant, Peter Webb, is an individual[1] who is a citizen of the United Kingdom. Mr. Webb worked at the Defendants' offices in San Mateo County at 2121 E. El

_____

[1] Individual Defendants Webb, Richardson and Richards were, all relevant times,

2

Camino Real, San Mateo, California 94403 performing his duties a supervisor as a full-time employee of Defendant Balfour Beatty Infrastructure Inc. and/or as an independent consultant or contractor of United. Mr. Webb used email addresses for both Balfour and United.

8.    Defendant, Wayne Richardson, is an individual who is a citizen of the United Kingdom. Mr. Richardson worked at Defendants' offices in San Mateo County at 2121 E. El Camino Real, San Mateo, California 94403 performing his duties a supervisor as a full-time employee of Defendant Balfour Beatty Infrastructure Inc. and/or as an officer of United. Mr. Richardson used email addresses for both Balfour and United.

9.    Defendant, Scott Richards, is an individual and a citizen of the United Kingdom. Mr. Richards works at Defendants' offices in San Mateo County at 2121 E. El Camino Real, San Mateo, California 94403 performing his duties a supervisor as a full-time employee of Defendant Balfour Beatty Infrastructure Inc. and/or as an independent consultant or contractor of United. Mr. Richard used email addresses for both Balfour and United. Mr. Richards, identified as an Officer on behalf of United Construction Management, Inc., signed the Consulting Agreement with Mr. Alghusain and the Professional Services Agreement between Balfour Beatty and United as a Principal.

10.    Defendant U.S. Rail Systems, Inc.  (hereinafter referred to as "U.S. Rail Systems, Inc." or "Defendant") is a contractor and/or sub-contractor registered with the State

---

supervisors of Defendants and a supervisor to Mr. Alghusain. The individual defendants were responsible for, in part, setting compensation for Mr. Alghusain, devising and administering the contract agreements, and approving Mr. Alghusain's work schedule.  As such, the individual defendants are within the definition of "other person acting on behalf of an employer" within the meaning of Labor Code § 558.1 as well as a person "acting on behalf of the employer" within the meaning of Labor Code § 1102.5(c). Defendants fall within the definition of "an officer or employee of such a railroad carrier" under the FRSA. 49 U.S.C. § 20109(b)(1).

3

of California Secretary of State with business address at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071.

### DOE DEFENDANTS

11.     Defendants DOES 1-20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Mr. Alghusain.  When the true names and capacities are ascertained, Mr. Alghusain will amend this complaint by inserting their true names and capacities herein.  Mr. Alghusain is informed and believes and thereon alleges that at least some of the fictitiously named defendants claim an interest.

### EXHAUSTION OF ADMINISTRATIVE PROCEDURES

12.     Mr. Alghusain filed a *pro se* complaint with United States Department of Labor on August 21, 2023 under the Federal Railroad Safety Act and the National Transit Systems Security Act. In the caption of his *pro se*  complaint, Mr. Alghusain identified Peter Webb, Balfour Beatty Infrastructure, Inc. and United Construction Management, Inc. as the respondents. In the body of the complaint, Mr. Alghusain identified Wayne Richardson as the site manager for United who stated "Finish the submittals even if they are wrong or unsafe, we need to close out and get out of this CALTRAIN mess" and was on the phone call with Peter Webb terminating Mr. Alghusain's employment. Acting as a Principal for United at the time of Mr. Alghusain's hiring and termination, Scott Richards was involved in the acts giving rise to the Department of Labor claims and should have anticipated that he would be named if the Department of Labor continued with its investigation.  On April 12, 2024, the United States Department of Labor issued a right to file a lawsuit letter having not concluded its investigation with 210 days.

4

### SUMMARY OF ACTION

13. Mr. Alghusain is a Railroad & Trains Engineer with more than 20 years of experience with a focus on Rail & Transit agencies in the USA, Asia, and Europe.

14. He has a bachelor's degree in electrical engineering from the Jordanian Isra University in Amman, Jordan and a master's degrees in electrical engineering from Cleveland State University in Ohio.

15. United approached Mr. Alghusain in June 2023 on behalf of Defendant Balfour to solicit his high-level electrical engineering skills and services.

16. United offered Mr. Alghusain a "contractor" position as Senior Electrical Trains & Electrification Engineer to work for Balfour in the last stage of CALTRAIN electrification project.

17. Mr. Alghusain was required to sign a three year non-compete agreement "as a condition of employment" with United. Mr. Alghusain and Mr. Richards signed this non-compete agreement on June 1, 2023.

18. From July 3, 2023, and until August 3, 2023, Mr. Alghusain was an employee (or in the alternative a contractor) for United and Balfour in a joint employer relationship.

19. Mr. Alghusain was provided and used computers and email addresses for both Balfour and United.

20. Mr. Alghusain was also considered a sub- employee and subcontractor for the Peninsula Corridor Joint Powers Board, known as "CALTRAIN".

21. CALTRAIN is a State of California commuter rail carrier between San Jose and San Francisco. CALTRAIN is regulated by the Federal Railroad Administration (FRA), by the Federal Transit Administration (FTA), by the California Public Utilities Commission (CPUC), by the National Transit Systems Security Act, and by the United States Department of Transportation (DOT).

5

22. Defendant Balfour Beatty Infrastructure Inc (Balfour) is an out of state corporation operating in the State of California.

23.  Balfour's parent company is based in the United Kingdom and is engaged in civil and railroad construction business in UK and USA.

24. Balfour received more than $2 billion dollars in state and federal contracts (including initial contract and follow up contracts where the cost has risen to 5 times the agreed-on amount in 2016) to build CALTRAIN electrified railroad line from San Jose to San Francisco for CALTRAIN in preparation for the new electric trains that were anticipated to be in service by summer 2019.

25. Five years later, the service has been delayed even more creating pressure on Balfour to complete the project.

26. Balfour's incompetency is costing the taxpayers hundreds of millions of dollars every year in additional funding. This $2 billion contract was funded by state and federal grants over the last 10 years.

27. Like Mr. Alghusain, the individual defendants identified above worked in Balfour's office building at 2121 E. El Camino Real, San Mateo, California 94403 and were provided work computers and cell phones from Balfour.

28. Mr. Alghusian has not received Employee W-2 tax form nor 1099 independent contractor tax form from either Balfour or United.

29. Mr. Alghusain claims that he was a full-time employee who was intentionally misclassified by Balfour and United as an independent contractor.

30. Mr. Alghusain and United entered into a written contract to perform work for Balfour. (Attached as Ex. 1).

31. Balfour was technically unable to complete final testing of the CALTRAIN electrification project.

32. Balfour was rushing to deliver the project documents resulting in an unsafe, incomplete, and inadequate manner to CALTRAIN.

33. Balfour has been defrauding CALTRAIN, California taxpayers and the American people since 2016 by failing to deliver an adequate and safe electrified rail line on time. As a result, this landmark project has been delayed many times by Balfour due to technical incompetence and Balfour's desire to take more money from CALTRAIN.

34. Related to Balfour's inability to complete the project successfully and safely, Scott Richards stated to Mr. Alghusain that Balfour is struggling technically with the most difficult phase of the CALTRAIN electrification project, which is defined by the CALTRAIN-BBII contract as the Close-Out "CO" of the project and the Entry-Into-Service "EIS".

35. The Close-Out is the last phase to assess and validate the entire electrified system and develop the final safety, operations, maintenance and training documents and manuals to be handed to CALTRAIN.

36. This task also requires proper and technical testing of the entire electrical components to the satisfaction of CALTRAIN technical teams.

37. When Mr. Alghusain entered into this employment or contractor agreement in good faith with Defendants, and he was very excited to leverage his knowledge and experience to close this project properly and safely for Balfour to deliver to CALTRAIN.

38. Mr. Alghusain took pride in the CALTRAIN line as it serves his communities, CALTRAIN employs many close friends of Mr. Alghusain, and serves him personally as a public mode of transportation.

7

39. Mr. Alghusain was excited to complete the safety, operations, maintenance and training documents and hand the documents to CALTRAIN on behalf of Balfour for proper and safe implementation to operate the new electric trains by 2023.

40. The due date for the Close-out was pushed until 2024. As an Engineer, Mr. Alghusain believed that it was not ready as 50% of the work needed to be re-done properly by Balfour.

41. On his first day with Balfour/United on July 3, 2023, Mr. Alghusain was stationed at Balfour's offices at 2121 E. El Camino Real, San Mateo, California 94403.

42. Although Mr. Alghusain was initially under the impression that he was an independent contractor, Defendants required him to work 50 hours per week, every day in the offices of Defendant Balfour, under direct supervision of Scott Richards, Wayne Richardson and Michael Vaz, who in turn reported to Peter Webb.

43. Mr. Alghusain was never paid overtime, meal or rest breaks, and did not get paid for the 4th of July holiday.

44. Defendants never offered Mr. Alghusain healthcare, medical or dental benefits.

45. Defendants denied Mr. Alghusain employee benefits such as retirement, housing allowance, car allowance, paid time off, vacation or any other benefits claiming him to be a consultant and independent contractor.

46. However, Mr. Alghusain was managed as employee and was never given the opportunity to produce his own independent work.

47. Mr. Alghusain was asked to sign blindly on documents and reports that were poorly produced by a copy/paste format from the internet.

48. When Mr. Alghusain started reviewing the safety, operations, maintenance, and training documents, he quickly saw many deficiencies in the quantity and quality of these documents.

8

49. Mr. Alghusain formed the opinion that Balfour has hired many inexperienced sub-contractors, engineers, interns and junior engineers at cheap pay rate who lacked the experience and the understanding of the danger and liability associated with producing high level technical, safety, operations, maintenance, and training documents for electric trains that will carry residents of California and tourists from all over the world visiting the Bay Area.

50. These above-referenced documents are critically important because after Balfour leaves the project, CALTRAIN will use these documents as guide for the daily 24/7 operations and maintenance of the new CALTRAIN electric trains and the electrification system for the next 25 years.

51. Mr. Alghusain discovered that these important and safety-sensitive documents created by Balfour were unprofessional in copy/paste formats from the internet, lacking the originality and legal ownership.

52. The documentation was wrong and not verified by any engineer or manager per FRA/CPUC rules. The documents were not in proper order, and many testing reports as required by the CALTRAIN contract were not completed as required.

53. Mr. Alghusain met with the management team including Michael Vaz and Matt Brassington from Balfour and Wayne Richardson from United on the third week on the job during the last week of July 2023.

54. Mr. Alghusain clearly stated to the management team including Michael Vaz and Matt Brassington from Balfour and Wayne Richardson from United the true status of the documents and reports in writing and verbally that the quality and quantity of these documents are not compliant with the railroad safety standards.

55. Mr. Alghusain clearly stated to the Balfour and United management team that the system as it stands now is not safe, and if operated as is will cause electric flash-over

with the risk of killing people, referring to most people in danger will be the electricians, some who are his best friends working at the CALTRAIN line, who are working on the overhead power cables and the workers testing, operating and maintaining the power substations that provide high voltage to the overhead power cables.

56. On the third week of July, Mr. Alghusain sent an e-mail to the management team including Michael Vaz and Matt Brassington from Balfour and Wayne Richardson from United management and safety officers titled "My technical assessment of the electrification project".

57. No immediate response was sent to Mr. Alghusain until Defendant Wayne Richardson came to his office within few minutes after he sent the e-mail.

58. Mr. Richardson was angry and seemed drunk as Mr. Alghusain smelled alcohol odor coming from Mr. Richardson, who said: *"I was just at the top floor and I spoke with the big boys, they do not want to hear your technical assessment, just sign the documents and stop sending e-mails to the top floor"*, in reference to Balfour's top management.

59. Defendant Wayne Richardson summoned Mr. Alghusain to meet with him and engineer Albert and engineer Adolfo from Balfour.

60. Mr. Richardson said to Mr. Alghusain in the meeting that *"it seems you are struggling with the technical documents submittals and you are not sending the documents to CALTRAIN"*.

61. Mr. Alghusain responded at this meeting that these are extremely important documents that need extensive review and validation and cannot be sent to CALTRAIN as they stand now as they are test procedures, and the project leads need accurate and verified documents before a testing of the system can occur.

10

62. Albert stated his agreement with Mr. Alghusain.

63. An hour later Defendant Richardson came to Mr. Alghusain and made uncomfortable comments to him about Albert and Adolfo by saying *"I do not care what this Mexican guy says (in reference to Albert) and I do not care what this tiny Asian guy (in reference to Adolfo) from quality engineering say to you about the documents, just ignore them and sign the documents"*.

64. Mr. Alghusain responded to Mr. Richardson that *"these statements are not appropriate; they both are American citizens and Adolfo deserves respect because he served our country in the US armed forces"*.

65. In the third week of July, Mr. Scott Richards, President of United met with Mr. Alghusain at Balfour offices. Mr. Alghusain stated: *"I am very concerned about the technical documents correctness and accuracy and they are NOT safe and BBII will kill someone"*; Mr. Richards responded: *"I assure you that you will be fine, no one at CALTRAIN even review these documents anyway"* and continued "*We all know this CALTRAIN project is F***ed up, so not our problem, just listen to Wayne and sign on these documents, we have a lot of work to do until CALTRAIN start reviewing these documents"*.

66. In a follow up meeting few days later, the management team including Michael Vaz and Matt Brassington from Balfour and Wayne Richardson from United came to Mr. Alghusain's cubicle. Mr. Alghusain assured them that he can review, correct, develop, validate, and produce adequate and safe documents per the railroad and industry strict engineering standards especially American Railway Engineering and Maintenance-of-Way Association (AREMA), Institute of Electrical and Electronics Engineers (IEEE), National Electrical Manufacturers Association (NEMA), American

11

National Standards Institute (ANSI), and International Electrical Testing Association (NETA) standards.

67. Mr. Alghusain also assured them that he can work with them to fix these designs and construction deficiencies.

68. However, it has become clear to Mr. Alghusain that Balfour and United did not want to spend more money or allocate resources to correct these deficiencies. Instead, Balfour and United simply wanted to dump the liabilities and these unsafe documents on the next contractors such as HERZOG and Transit America Services Inc (TASI).

69. Because Mr. Alghusain cares about CALTRAIN and the many workers at the CALTRAIN railroad line and the daily passengers who are his friends, colleagues, and neighbors, Mr. Alghusain advised BBII and UNITED to take a serious look at the documents to properly review them and to re-do major repairs to the power substations and the overhead lines and all computer control networks.

70. Mr. Alghusain remained shocked that most of these test procedures do not reference the appropriate safety standards, they were not evaluated by engineers, and they were not approved by any manager per FRA/CPUC standards.

71. Mr. Alghusain was shocked that most grounding and bonding of these power substations in the field that he saw have not been completed or properly installed, and most negative return cables connected to the rail were not properly exothermically welded or mechanically connected per IEEE837 engineering Standards.

72. Unwelded power cables and loose wires connection to the rail in any electrified train power systems are extremely dangerous and will cause flash-over of high voltage from OCS above the trains to the transformers and top of the train all the way to the railroad tracks.

73. The industry standards strongly recommend that when attaching electrical copper cable to ground rod in the rail system to immediately pour concrete on it to cover them and to prevent homeless and thieves from stealing expensive copper wires from the rail system. This fact alone makes the system unsafe for safe electrical operations of the electric trains on a regular basis as the system will deteriorate over time.

74. Mr. Alghusain advised Balfour field engineers to correct these deficiencies asap before they test the system with the new electrical trains.

75. As Mr. Alghusain predicted, Balfour and United ignored his repeated advice and two safety incidents occurred within one month of his recommendation: the first one in San Jose in mid-July when the overhead power in the cable flashed over the new electric trains and almost killed two workers near the trains; the second occurred on August 12, 2023, when Balfour was conducting another testing on another new electric train, the crew heard a loud explosion from the power substation and caused circuit breaker to trip and that is more likely due to poor grounding or improper negative return cable not conducting electrical current to a safe grounding system.

76. United management's first response to Mr. Alghusain came from their site manager; Mr. Richardson, who said to him: "*I do not care if the documents are wrong or unsafe, just sign the documents and send over to CALTRAIN, we need to close this project and leave asap*".

77. Mr. Alghusain was shocked and surprised when he met with Mr. Michael Vaz from Balfour. Mr. Vaz is a senior manager of BBII, who said to him: "*We must submit these documents to CALTRAIN by November 15, 2023, regardless so if BBII/UNITED do not get a response within 45 day from CALTRAIN, we can close out this project with CALTRAIN regardless if they reviewed them or not*".

13

78. Mr. Alghusain explained to Mr. Vaz the situation, who did not seem to care and asked Mr. Alghusain to submit what he had.

79. Mr. Alghusain submitted a total of 20 documents which he considered safe and adequate, but he refused to sign on the other 100+ pending documents because they are wrong, unsafe and required re-testing and re-construction.

80. Mr. Alghusain formed the opinion that Balfour and United has no regard for the American peoples' lives and all they cared about was to cut corners and rush the delivery of these safety, operations, maintenance and training documents to CALTRAIN even if they were wrong, unsafe and inadequate so they can close out the project and receive the final and substantial project completion payment from CALTRAIN estimated at $300 million.

81.  The Balfour and United BBII management team started to lose patience with Mr. Alghusain over his technical advice and safety warnings, and Mr. Richardson kept telling him: "*finish the documents and sign on the reports even if they are wrong or unsafe, we need to close this project out and get out of this mess*".

82. Mr. Alghusain stated this is not the proper way to close out this project; Balfour and United management responded that all labilities will be passed on to the next contractor in reference to Contractors HERZOG and Transit America Services Inc.

83. On Wednesday August 2, 2023, at 8 a.m., Mr. Alghusain went with Balfour Project Engineer John Cobble to check on Power Station #1 in San Francisco.

84. Mr. Alghusain noticed that Mr. Cobble kept saying the word *F\*\*\** a lot in reference to incomplete construction and wrongly wired cables at the power station by the railroad tracks.

85. Mr. Alghusain was shocked during the inspection that day because the papers and test reports did not match the actual field status of the power stations. Simply looking at

14

the train power station, it was in bad shape and missing many safety and grounding
wires. The 25kV transformer seems to have been abandoned for many years by
Balfour and United and no regular preventive maintenance was completed at all and
there were no engineering records on these power stations at all.

86. As the Engineer, Mr. Alghusain's job was to validate what is on engineering/ safety
papers must match the actual products/installation in the field.

87. Mr. Alghusain immediately raised his concerns to Balfour and United and was firmly
told by Mr. Richardson to stop looking at the field and only finish and sign the
submittals papers at the office blindly.

88. Mr. Alghusain believed that Balfour and United management did not want him to be
in the field to compare and validate the information on Balfour's papers to be actually
and physically true in the field.

89. Matt Brassington, Michael Vaz and Wayne Richardson became extremely angry at
Mr. Alghusain for going to test the components of the system and they insisted that he
sign documents and not to ask questions, to which Mr. Alghusain refused.

90. On Thursday August 3, 2023, Mr. Alghusain went with Balfour safety representative
Daniel Costa and new manager named Fred per their request to another field safety
observation and site visit in San Jose.

91. Mr. Alghusain, Mr. Costa and Fred left San Mateo at 12:30 pm to go visit three of San
Jose main rail stations.

92. Mr. Richardson called Mr. Alghusain at 3:15 pm and was angry and then he called
him again at 3:45 pm which sounded like he is on a speaker with Mr. Richardson and
with a man with British accent, who Mr. Alghusain believed was Peter Webb.  Mr.
Richardson did not tell Mr. Alghusain that he was on speaker.

93. Mr. Webb got on the call and said with loud and angry voice to Mr. Alghusain: *"Do not bother coming to the office tomorrow, F*** off, you are fired"*.

94. When Defendant Webb said the above words loudly at Balfour offices, he embarrassed Mr. Alghusain and humiliated him in the front of other Balfour employees, IBEW union workers, and third-party contractors.

95. On Saturday August 5th, 2023, Mr. Alghusain was very upset with the situation and sent a text message to Mr. Richardson informing him that Mr. Alghusain will be sending a report to the federal authority and to CALTRAIN.

96. On Monday August 7, 2023, Mr. Alghusain received an email from Karen Bowen, an attorney for United, informing him that Balfour Beatty disqualified him from services on the project and therefore the Consulting Agreement is being terminated effective immediately.

97. After his termination, one or more of the Defendants electronically signed Mr. Alghusain's electronic signatures on many technical documents and submitted them via ACONEX to CALTRAIN without his consent or knowledge.

98. George Mendoza, from Quality Engineering, Inc., worked in quality control on the rail project and informed Mr. Algusain that documents were submitted to the Aconex database with Mr. Algusain's e-signature after he was terminated.

99. Mr. Alghusain did not sign on these sets of documents and specifically told Defendants that the system is not safe and asked them to remove his name from being stamped on any document related to the Close Out and Entry Into Service phase of CALTRAIN Electrification project.

100.    However, Defendants used Mr. Alghusain's electronic signature to give legitimacy to their documents submitted to CALTRAIN using the fact that Mr.

16

Alghusain was one of the most senior and most technically knowledgeable engineers on the CALTRAIN electrification project.

101.    Prior to his work at United and Balfour, Mr. Alghusain developed important technical documents bearing his brand names, trademarks, and service marks American Rail™, American Railways™, US RAIL™, USA Rail™, and he developed the following documents for future use/contracts with CALTRAIN, HERZOG and possible Balfour future work and others, these documents and intellectual property are the sole ownership of Mr. Alghusain, they are:

- List of current, former and potential customers.
- Business and professional bidding templates.
- Operations and Maintenance of Electric Trains, and Operations and Maintenance of Equipment related to Electric Trains.
- Welding Manual for tracks to tracks.
- Welding manual for grounding and bonding for railways applications.
- Apprenticeship program for rail power systems, in cooperation with Mission College.
- Maintenance of overhead power systems,
- Power On/Power Off of rail power systems.
- Operations and Maintenance of transformers and supporting power systems,
- Inspection of power substations, electromagnetic power and induced electricity manual.
- Surge and protection of railways power infrastructure.
- Short circuit loops tools and equipment.
- Training manuals for Electric trains, Operations and Maintenance, Grounding, safety and tools related to electrified trains system in the US.

17

- Business presentations for future CALTRAIN and HERZOG bids, including his resume, qualification, prior experience, past projects.

102.    After Mr. Alghusain was terminated, Scott Richards and Wayne Richardson used the same documents and manuals and presentation developed by Ameer Alghusain to create a new business called US RAIL Systems, without any regards to Mr. Alghusain brand name and trademark US Rail™ that is solely owned by Ameer Alghusain in the electric trains and electrification markets since 2002.

103.    Defendants Scott Richards and Wayne Richardson formed a new company in the state of California called US Rail™ Systems Inc., entity #6325652, and used Mr. Alghusain trade secrets, trade names, trademarks, know-how, customers lists and highly valuable technical manuals and they used his business bidding files to obtain three contracts in the US, one with CALTRAIN for $1.5 million, one with HERZOG TASI for $1.6 million and one for $500,000 with Dallas Area Rapid Transit (all are former and potential customers of Mr. Alghusain) .

104.    Defendants Wayne Richardson and Scott Richards benefited from Mr. Alghusain cumulative work, IPs and manuals and documents and made it appear as their own work.

105.    Mr. Alghusain seek to enjoin Defendants U.S. Rail Systems, Inc., Wayne Richardson and Scott Richards from using Mr. Alghusain's IPs, information, manuals, trademarks, and all valuable things,

**FIRST CAUSE OF ACTION**
**Federal Railroad Safety Act (FRSA) 49 U.S.C. § 20109**
**(Balfour and All Individual Defendants)**

18

106.    Mr. Alghusain incorporates by reference all of the above allegations set forth in this Complaint.

107.    The Federal Railroad Safety Act, 49 U.S.C. § 20109, protects employees of railroad carriers and their contractors and subcontractors from retaliation for reporting a work-place injury or illness, a hazardous safety or security condition, a violation of any federal law or regulation relating to railroad safety or security, or the abuse of public funds appropriated for railroad safety. In addition, the statute protects employees from retaliation for refusing to work when confronted by a hazardous safety or security condition.

108.    Subsection (2) states that a refusal is protected under paragraph (1)(B) and (C) if the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee and the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work.

109.    Mr. Alghusain was an employee and contractor for Defendants and as a subcontractor for CALTRAIN. Defendants terminated his contract and employment because he reported to Balfour, United and CALTRAIN and the federal authorities that the safety, operations, maintenance and training documents required by CALTRAIN are unsafe, incomplete and inadequate and they will endanger Americans if used as a basis to operate or maintain the CALTRAIN commuter rail line.

110.    Mr. Alghusain engaged in multiple protected acts, as alleged in the above paragraphs concerning unsafe conditions and inaccurate documentation.

111.    With knowledge of these protected acts, Defendants, and each of them, took adverse actions against Mr. Alghusain including but not limited to terminating his employment.

19

112.     Plaintiff's contract as a subcontractor for CALTRAIN, and a contractor for Balfour and UNITED was terminated because Mr. Alghusain refused to perform the work they asked him to do and by refusing to illegally sign on the safety, operations, maintenance and training documents required by CALTRAIN because they are unsafe, incomplete and inadequate and they will endanger Americans if used as basis to operate or maintain the CALTRAIN commuter rail line.

113.     The adverse actions taken by defendants, and each of them resulting in termination were due in whole or in part to the protected acts of Mr. Alghusain.  Any and all additional adverse actions taken by Defendants against Mr. Alghusain will be due in whole or in part to his protected acts and were in willful and/or reckless disregard for his rights under the FRSA.

114.     By reporting the unsafe conditions and improper documentation, Mr. Alghusain was protected under 20109 (b)(1) because his protected activities were about hazardous conditions.

115.     Section 20109 states the following: (b) Hazardous safety or security conditions.--(1) A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for--(A) reporting, in good faith, a hazardous safety or security condition; (B) refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties, if the conditions described in paragraph (2) exist; or (C) refusing to authorize the use of any safety-related equipment, track, or structures, if the employee is responsible for the inspection or repair of the equipment, track, or structures, when the employee believes that the equipment, track, or structures are in a

20

hazardous safety or security condition, if the conditions described in paragraph (2) exist.

116.     As a direct, foreseeable, and proximate result of Defendants' conduct, Mr. Alghusain suffered lost income, employment career opportunities, and suffered and continue to suffer other economic loss, in an amount to be proven at trial. As a direct, foreseeable, and proximate result of Defendants' conduct, Mr. Alghusain suffered emotional distress, in an amount to be proven at trial.

117.     Defendants acted with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law and were carried out by Defendants and Defendants' business partners, managing agents, directors, supervisors, and managers and/or ratified by Defendants. Accordingly, Plaintiff seeks to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### National Transit Systems Security Act (NTSSA) (2007) 6 U.S.C. § 1142
#### (Balfour and All Individual Defendants)

118.     Mr. Alghusain incorporates by reference all of the above allegations set forth in this Complaint.

119.     The National Transit Systems Security Act (NTSSA) (2007) 6 U.S.C. § 1142 protects transit employees, contractors and subcontractors from retaliation for reporting a hazardous safety or security condition, a violation of any federal law relating to public transportation agency safety, or the abuse of federal grants or other public funds appropriated for public transportation. The Act also protects public transit employees from retaliation for refusing to work when confronted by a hazardous

safety or security condition or refusing to violate a federal law related to public transportation safety.

120.    Mr. Alghusain was an employee and contractor for Defendants and a subcontractor for CALTRAIN.

121.    Defendants terminated his contract because Mr. Alghusain reported to CALTRAIN and federal authorities that the safety, operations, maintenance, and training documents required by CALTRAIN are unsafe, incomplete and inadequate and they will endanger Americans if used as a basis to operate or maintain the CALTRAIN commuter rail line.

122.    Mr. Alghusain's contract and employment as a subcontractor for CALTRAIN, and an employee or contractor for Balfour and UNITED was also terminated because he refused to perform the work they asked him to do and by refusing to illegally sign on the safety, operations, maintenance and training documents required by CALTRAIN because they are unsafe, incomplete and inadequate and they will endanger Americans if used as basis to operate or maintain the CALTRAIN commuter rail line.

123.    As a direct, foreseeable, and proximate result of Defendants' conduct, Mr. Alghusain suffered lost income, employment career opportunities, and suffered and continues to suffer other economic loss, in an amount to be proven at trial.

124.    As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, in an amount to be proven at trial.

125.    Defendants acted with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law and were carried out by Defendants and Defendants' business partners, managing agents, directors, supervisors, and managers and/or

22

ratified by Defendants. Accordingly, Plaintiff seeks to punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Violation of California Labor Code § 1102.5 LC – Whistleblowing Protections
### (Balfour and All Individual Defendants)

126.     Mr. Alghusain incorporates by reference all of the above allegations set forth in this Complaint.

127.     California Labor Code § 1102.5 prohibits employers from retaliating against whistleblower employees who inform the government or the employers themselves about the employer breaking the law.

128.     California Labor Code 1102.5: (a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties. (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or

23

noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties. (c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. (d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised their rights under subdivision (a), (b), or (c) in any former employment.

129.    Plaintiff claims that Defendants discharged him in retaliation for his disclosure of improper safety practices and documentation.

130.    At all relevant times, Defendants were functioning as Mr. Alghusain's employer under the California Labor Code.

131.    Plaintiff's complaints were a contributing factor in the decision to terminate him.

132.    As a result of such conduct, Plaintiff suffered and continues to suffer harm.

133.    Defendants' actions were taken with malice, oppression, fraud, and/or willful and conscious disregard of his rights and were carried out by Defendants and Defendants' business partners, managing agents, directors, supervisors, and managers and/or ratified by Defendants.

134.    Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Wage and Hour Violations for Failure to Pay Overtime Compensation under California Labor Code 510, 558 and Wage Order 5 and California Labor Code 1194, 1197, 1197.1)
### (Balfour and All Individual Defendants)

135.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

136.    Defendants willfully violated Section 1194 of the California Labor Code and the Industrial Welfare and Commission Order No. 16-2001 and other wage orders which require compensation to non-exempt employees such as the Plaintiff.

137.    Defendants intentionally misclassified Mr. Alghusain as an independent contractor.

138.    As a result of these violations, Plaintiff has not been paid his full compensation in an amount to be established in discovery or trial including attorneys' fees, costs under California Labor Code 1194, 218.5 and 218.6.

## FIFTH CAUSE OF ACTION
### (Failure to Provide Meal Periods under California Labor Code 226.7, 512 and Wage Order 5)
### (Balfour and All Individual Defendants)

139.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

140.    Section 226.7 and 512 of the California Labor Code, Industrial Welfare and Commission Order No. 16-2001, and Section 10 of the Wage Orders require an employer to provide unpaid meal breaks of at least thirty minutes for each five-hour period of time worked.

141.    Defendants willfully violated California Labor Code 226.7 by requiring the Plaintiffs to work during their otherwise mandated meal periods.

142.    Accordingly, Plaintiffs did not receive the compensation for which they worked during the otherwise mandated meal periods.

143.    As a result of these violations, Plaintiffs have not been paid their full compensation in an amount to be established in discovery or trial including attorneys' fees, costs under California Labor Code 1194, 218.5, 218.6, and premium pay of one hour's pay under Section 226.7 and Sections 10 and 11 of the Wage Orders.

**SIXTH CAUSE OF ACTION**
**(Failure to Provide Rest Periods under California Labor Code 226.7 and 512)**
**(Balfour and All Individual Defendants)**

144.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

145.    Section 512 of the California Labor Code, Industrial Welfare and Commission Order No. 16-2001, and Section 11 of the Wage Orders require an employer to provide a ten-minute rest period for every four hours worked.

146.    Defendant willfully violated California Labor Code 226.7 by requiring the Plaintiff to work without the mandated rest periods.

147.    As a result of these violations, Plaintiff has not been paid his full compensation in an amount to be established in discovery or trial including attorneys' fees, costs under California Labor Code 1194, 218.5, 218.6, and premium pay of one hour's pay under Section 226.7 and Sections 10 and 11 of the Wage Orders.

**SEVENTH CAUSE OF ACTION**
**(Failure to Provide and Maintain Accurate Wage Statements and Records under California Labor Code 226 and Wage Order 5)**
**(Balfour and All Individual Defendants)**

26

148.     Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

149.     Section 226 and 1174 of the California Labor Code and Industrial Welfare and Commission Order 16-2001 provide that an employer must maintain records of the hours worked daily and the wages paid to their employees and provide an accurate itemized statements of the hours worked.

150.     Defendant willfully failed to provide accurate records of the hours worked by Plaintiffs including travel time, meal periods and rest breaks.

151.     Defendant's policy and practice of not maintaining accurate wage statements and records has caused harm to the Plaintiffs in an amount to be determined in discovery or trial. In the alternative, Plaintiff is entitled to recover either actual damages or fifty dollars for the initial pay period and one hundred dollars for each subsequent pay period not exceeding an aggregate penalty of four thousand dollars.

### **EIGHTH CAUSE OF ACTION**
### **(Unfair Business Practices- Bus. And Prof. Code 17200-17208)**
### **(Balfour Beatty Infrastructure, Inc.)**

152.     Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

153.     Defendants are persons as defined by Bus. And Prof. Code 17201.

154.     Defendants' conduct has been and continues to be unfair, unlawful and harmful to Plaintiff and the public.

155.     Plaintiffs seek to enforce such rights affecting public interest within the meaning of C.C.P. 1021.5.

156.     Defendants' conduct are violations of California Bus. And Prof. Code 17200 et seq.

27

157.    Plaintiffs are entitled to restitution of the wages withheld and retained by Defendants during the period of time commencing four years prior to the filing of this lawsuit.

158.    In addition to full compensation, Plaintiffs seek injunctive relief, attorneys' fees, costs, and interest.

159.    A violation of the California Bus. And Prof. Code may be based upon a violation of state or federal law. All of the acts and omissions in this complaint are unlawful and violations of public policy constituting immoral, unethical, oppressive, fraudulent and unscrupulous conduct equivalent to unfair, unlawful and/or fraudulent business practices in violation of Bus. And Prof. Code 17200 et seq.

160.    As a result of this conduct, Defendants have gained unfair benefits and illegal profits at the expense of Plaintiffs and to the advantage of their competitors in the following: Failure to Pay Wages and Overtime Compensation in violation of California Labor Code 510, 1194, 1198 and Bus. And Prof. Code 17200 et seq.; 2) Failure to Provide Meal Periods under California Labor Code 226.7, 512, Wage Orders and Bus. and Prof. Code 17200 et seq.; 3) Failure to Provide Rest Periods under California labor Code 226.7, Wage Orders and Bus. And Prof. Code 17200 et seq.; and 4) Failure to Maintain and Provide Accurate Wage Statements under California Labor Code 226 and Bus. And Prof. Code 17200 et seq.

## NINTH CAUSE OF ACTION
## CALIFORNIA DEFAMATION LAW, CODE 44, 45A AND 46
**(Balfour and All Individual Defendants)**

161.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

28

162.     To establish a defamation claim in California, Plaintiff must prove in this action four facts: 1) That the defendants made a false statement of purported fact about Plaintiff;: 2) That the statements were made and published to a third party; 3) That the defendants who made the statement did so negligently, recklessly and/or intentionally; and; 4) That as a result of the statement, Plaintiff's reputation was damaged.

163.     California law recognizes two types of defamation: libel and slander. The main difference is whether a defamatory statement was made verbally (constituting slander) or in writing or other tangible medium (constituting libel).

164.     Defendants, Webb, Richardson and Richards, and each of them, made false statements both verbally and in writing about Plaintiff to CALTRAIN and to the union organization executives and members of the International Brotherhood of Electrical Workers (IBEW), and these defamatory statements were made in writing and verbally to other subcontractors like Modern Rail Systems, Herzog, STADLER, Transit America Services Inc (TASI), Mass Electric, and to other third parties on the CALTRAIN project.

165.     As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered lost income, employment career opportunities, current and future business contracts and suffered and continues to suffer other economic loss, in an amount to be proven at trial.

166.     These false statements include "*1. Ameer has stolen the gate code, 2. Ameer is trespassing on the property, 3. Ameer has been fired from CALTRAIN, 4. Ameer has entered live train depot illegally, 5. Ameer is incompetent, 6. Ameer is struggling with technical documents, and other harmful statements.*

167.    As a direct, foreseeable, and proximate result of Defendants' conduct and false statements, Plaintiff suffered damage to his reputation in the industry and emotional distress, in an amount to be proven at trial.

168.    Defendants' actions were taken with malice, oppression, fraud, and/or willful and conscious disregard of his rights and were carried out by Defendants and Defendants' business partners, managing agents, directors, supervisors, and managers and/or ratified by Defendants.

169.    Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
## (ALL DEFENDANTS)

170.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

171.    Plaintiff's claim for interference with prospective economic relations is based upon the conduct of Defendants causing Plaintiff to suffer lost contracts in the future and these defendants have done it intentionally and with a reckless disregard for its effect on Mr. Alghusian and/or negligently.

172.    Mr. Alghusain submitted a bid in July of 2023 for an apprenticeship program to Herzog for a three-year contract in an amount of $309,600 annually.

173.    After the Defendants' statements set forth in paragraph 166, Mr. Alghusian did not get the contract despite initial assurances by Herzog.

174.    Defendants communicated with subcontractors and to other third parties on the CALTRAIN project misrepresenting Plaintiff's abilities and credentials.

30

175.     As a result of Defendants' conduct, Plaintiff seeks all available remedies including loss of profits.

### ELEVENTH CAUSE OF ACTION AND CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA, 18 U.S.C. 1839(5)
### (Individual Defendants, Richards and Richardson, and U.S. Rail Systems, Inc. )

176.     Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

177.     Mr. Alghusain created and owned the above referenced trade secrets in paragraph 101 before working for United.

178.     Mr. Alghusain took reasonable steps to maintain the information secret including the requirement to have Defendants sign non-disclosure agreements.

179.     The trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

180.     The Defendants misappropriated the trade secrets during their employment with United and after in creating U.S. Rail Systems, Inc.

181.     The DTSA, 18 U.S.C.A. § 1839(5), provides two different ways one can be liable for misappropriation: (1) acquisition; and (2) disclosure/use.

182.      The disclosure or use of a trade secret of another without express or implied consent by a person who: used improper means to acquire knowledge of the trade secret; at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived through improper means.

31

183.    As a result of this conduct, Defendants have secured rail contracts causing damage to Mr. Alghusain in being denied contracts through the bidding process and otherwise denied employment opportunities.

### TWELVTH CAUSE OF ACTION AND CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS UNDER CUTSA
### (Individual Defendants, Richards and Richardson, and U.S. Rail Systems, Inc. )

184.    Plaintiff incorporates by reference the allegations above as if they were fully set forth herein.

185.    Mr. Alghusain created and owned the above referenced in paragraph 101 having developed them over decades of work in the rail industry.

186.    Mr. Alghusain took reasonable steps to maintain the information secret including the requirement to have Defendants sign non-disclosure agreements.

187.    The trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

188.    The Defendants misappropriated the trade secrets during their employment with United and after in creating U.S. Rail Systems, Inc

189.    The disclosure or use of a trade secret of another without express or implied consent by a person who: used improper means to acquire knowledge of the trade secret; at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived through improper means.

190.    As a result of this conduct, Defendants have secured rail contracts causing damage to Mr. Alghusain in being denied contracts through the bidding process and otherwise denied employment opportunities.

32

1

## **PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiff requests relief as follows: (1) back pay, front pay, and other

3

special damages according to proof; (2) payment of the past and future economic

4

opportunities including the apprenticeship program;  (3) for compensatory damages; (4)

5

liquidated and punitive damages; (5) fully releasing Plaintiff from the Defendants' technical,

6

engineering, insurance and business liabilities in regard to the CALTRAIN project; (6) unpaid

7

wages including overtime, breaks, meals, and unpaid holidays; (7) punitive damages under

8

statutory and common law including under Labor Code 1102.5, 49 U.S.C. § 20109 and 6

9

U.S.C. § 1142; (8) equitable and declaratory relief including that this Court enjoin Defendants

10

from further violating the above laws including the misappropriate of trade secrets; (9)

11

prejudgment interest on all damages awarded; (10) reasonable attorney fees; (11) costs for

12

expert witnesses and of suit incurred; and (12) other and further relief as the Court may deem

13

just and proper including lump sum offset for tax consequences.

14

**A JURY TRIAL IS DEMANDED.**

15

Respectfully submitted,

16

17

PAUL LAW OFFICES

18

19
　　　　　/s Gregory G. Paul

GREGORY G. PAUL

20
Attorney for Plaintiff

Dated:  March 31, 2025.

21

22

23

24

25

26
33

27

28

1

2                            **<u>PROOF OF SERVICE</u>**

3    I am an adult over the age of 18 and not a party to the within action; my business

4    addresses is: 540 Pacific Avenue, San Francisco, CA 94133.

5            On **March 31, 2025**, the foregoing was served via this Court's CM/ECF filing system

6    upon the parties listed below:

7    Counsel of Record.

8

9       /s Gregory G. Paul

10   Gregory G. Paul

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                              34

27

28